UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
ADRIANA CONDOR CORDERO,                          :
                                                 :
                           Plaintiff,            :
                                                 :
        -against-                                :    COMPLAINT
                                                 :
HARRY ADJMI and ALICE ADJMI,                     :
                                                 :
                           Defendants.           :
------------------------------------------------------------------X

Plaintiff Adriana Condor Cordero ("Condor" or "Plaintiff"), by her attorneys Pechman Law Group PLLC, complaining of defendants Harry Adjmi and Alice Adjmi (collectively, the "Adjmis" or "Defendants"), alleges:

### NATURE OF THE ACTION

1.      The Adjmis employed Condor as a housekeeper for over six years. Throughout her employment, Defendants required Condor to work up to ninety-two hours per week and paid her on a daily rate basis, which failed to compensate her at the statutorily required minimum wage rate or at 1.5 times the applicable regular hourly rate for hours worked over forty per workweek. Defendants also failed to pay Condor spread-of-hours pay when she worked shifts longer than ten hours and failed to provide her with accurate wage statements with each payment of wages.

2.      Condor brings this action pursuant to the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"), the New York Labor Law § 190 *et seq.* ("NYLL"), the Domestic Workers' Bill of Rights ("DWBR"), the New York State Wage Theft Prevention Act ("WTPA"), and the New Jersey Wage and Hour Law, N.J.S.A. § 34:11 – 56(a) *et seq.* ("NJWHL") seeking declaratory relief against Defendants' unlawful actions and to recover unpaid minimum and overtime wages, spread-of-hours pay, liquidated and statutory damages, pre- and post-judgment interest, and attorneys' fees and costs.

## JURISDICTION

3. This Court has subject matter jurisdiction of this case pursuant to 29 U.S.C. § 216(b) and 28 U.S.C. §§ 1331 and 1337, and it has supplemental jurisdiction over Plaintiff's claims under the NYLL and NJWHL pursuant to 28 U.S.C. § 1367.

## VENUE

4. Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391 because Defendants reside in this district and many of the events and omissions alleged in this Complaint occurred in this district.

## THE PARTIES

### Plaintiff Adriana Condor Cordero

5. Plaintiff Adriana Condor Cordero resides in Kings County, New York.

6. Condor worked as a housekeeper for Defendants in their private homes in New York and New Jersey from March 2016 through June 19, 2022.

7. From approximately October of each year to May of the following year, Condor would work as a non-live-in housekeeper in Defendants' private homes in New York City, including a house in Brooklyn ("Brooklyn Residence") and an apartment on the tenth floor of an Upper East Side high-rise building ("Manhattan Residence").

8. From approximately May to September or October of each year, Condor worked as a live-in housekeeper for Defendants in their summer home in Deal, New Jersey ("New Jersey Residence").

### Defendants Harry Adjmi and Alice Adjmi

9. The Adjmis are husband and wife and residents of both Kings County, New York and Monmouth County, New Jersey. The couple has four adult children together and grandchildren ranging in age from a few months to 5 years.

10. Harry Adjmi is the owner and founder of One Step Up, a wholesale manufacturer of sportswear, medical apparel, and footwear. *See* https://onestepup.com (last visited December 14, 2022).

11. Harry Adjmi is also a principal of A&H Acquisitions Corp., a Manhattan-based private real estate investment and development firm with over 150 properties in New York, New Jersey, Massachusetts, Illinois, Florida, and California. *See* https://aandhacquisitions.com/about (last visited December 14, 2022).

12. Throughout Condor's employment, the Adjmis possessed and exercised direct and immediate control over her working conditions including regularly assigning and directing her work duties, determining her rate of pay, and hiring and firing her.

13. The Adjmis exercised sufficient control over Condor's employment to be considered her employer under the FLSA, NYLL, and NJWHL.

## FACTS

**Brooklyn and Manhattan Residences**

14. Throughout her employment, Condor worked as a non-live-in housekeeper at the Adjmi's Brooklyn and Manhattan Residences from September or October of each year until May of the following year.

15. Through the majority of Plaintiff's employment with the Adjmis, they employed a full-time cook responsible for preparing meals for the family and their guests at all their homes.

16. The Adjmis' Brooklyn Residence is a four-story, seven-bedroom, six-bathroom home with a back patio that the Adjmis used for entertaining guests.

17. Condor's duties at the Brooklyn Residence included cleaning all seven bedrooms, all six bathrooms, the kitchen, the living room, the parlor, the exercise room, and any other room and passageway in the house. She would on occasion be asked to

3

clean the back patio when the family was hosting events in that space. Condor would wash, iron, and fold the dirty laundry left by the Adjmis and their guests along with replacing and washing bedding from the various bedrooms. Condor also assisted in the preparation and serving of food whenever the cook was absent or when the Adjmis held special events or dinners.

18. The Adjmis' Manhattan Residence is a tenth-floor, three-bedroom, three-and-a-half bathroom luxury apartment located in Manhattan's Upper East Side. The Adjmis' twenty-nine-year-old son lives at this residence full-time.

19. Condor's duties at the Manhattan Residence included cleaning all three bedrooms, all three and a half bathrooms, the kitchen, the living room, the dining room, and all the hallways. Condor would wash, iron, and fold the laundry and bedding left by the Adjmis and their guests. She also assisted in the preparation and serving of food whenever the cook was absent or when the Adjmis held special events or dinners.

**New Jersey Residence**

20. Throughout her employment with the Defendants, Condor worked as a live-in housekeeper at the New Jersey Residence from May of each year to September or October of that year. In 2020, however, the family extended their stay at the New Jersey Residence until December because of the onset of the COVID-19 crisis.

21. The Adjmis' New Jersey Residence is a four-story, seven-bedroom, eight-bathroom home located in Deal, New Jersey. The property includes an in-ground pool with an adjoining patio area and pool house.

22. The Adjmis spent their summer months at the New Jersey Residence and frequently hosted family and guests. For example, the Adjmis' daughter would live at the New Jersey Residence with her two children for the duration of the summer.

23. Condor's duties at the New Jersey Residence included cleaning all seven bedrooms, all eight bathrooms, the kitchen, the living room, the parlors, the dining room, the exercise room, any other room or passageway in the home, and the adjoining patio and pool house. Condor washed and replaced bedsheets in all of the bedrooms in addition to washing, ironing, and folding any dirty clothes left by the Adjmis or their guests. She also assisted in the preparation and serving of food whenever the cook was absent or when the Adjmis held special events or dinners.

24. Because of the increased workload from additional guests and residents at the New Jersey Residence, the Adjmis would hire a part-time housekeeper to assist Condor from mid-June to mid-August of each year. During this period, the part-time housekeeper was responsible for cleaning the second and third floors while Condor was responsible for cleaning the basement, first floor, patio, and pool house.

25. In addition to these regular duties, Condor would on occasion be required to watch the Adjmis' grandchildren while at the New Jersey Residence. This included a three-year-old granddaughter and one-year-old grandson.

**Condor's Work Duties**

26. Condor would typically begin her workday at 9:00 a.m. at all of the residences by gathering the laundry and bedding that needed to be washed. She would then replace any bedding she removed with clean sheets and covers.

27. After loading the clothes and bedding into the washing machine at the various residences, Condor would begin cleaning the bedrooms, bathrooms, kitchen, living rooms, parlors, dining rooms, passageways, and any other rooms in the homes. This meant sweeping, vacuuming, and mopping all the floors while also picking up and washing any leftover dishes, cups, and utensils left throughout the home. While performing these duties, Condor would periodically return to the laundry room to move

laundry from the washing machine to the dryer, remove dry laundry from the dryer, and to fold, iron, and put away clothes and bedding as they finished drying.

28. Depending on the day of the week or if the cook was working, Condor would have to prepare meals for the family or assist in the preparation of food for events or dinners. For example, the Adjmis would host weekly family dinners on Fridays. Beyond assisting in the preparation of the food for this dinner, Condor would be required to stay late so that she could serve the food and clean up once the Adjmis and their guests had finished.

29. Friday night dinners were held year-round at all of the Adjmis' homes with the couple's children and their respective families regularly in attendance.

30. In mid-May 2022, the Adjmis' cook was diagnosed with breast cancer and went on indefinite leave. As a result, Defendants made Condor assume all cooking duties from approximately May 19, 2022, until the end of her employment on June 19, 2022. During this period, Condor performed all cooking duties in addition to completing her other responsibilities without any assistance from other employees.

31. As previously mentioned, Condor would on occasion assist in the care of two of the Adjmis' grandchildren staying at the New Jersey Residence, a three-year-old granddaughter and one-year-old grandson. She would watch, feed, clean, and entertain them, and on occasion, put them to bed.

**Condor's Work Schedule**

32. When working in the Brooklyn and Manhattan Residences, Condor's regular weekly work schedule was: Monday to Thursday from approximately 9:00 a.m. until 5:00 p.m.; Friday from approximately 9:00 a.m. until 11:00 p.m.; and Saturday from 9:00 a.m. to 5:00 p.m. Condor had Sundays off. During this period, Condor worked approximately fifty-four hours per week.

6

33. During this period, Condor would split her time between the Manhattan and Brooklyn Residences. When Friday dinners were held at the Brooklyn Residence, Condor would only work at the Manhattan Residence on Tuesdays and spend the rest of her work days at the Brooklyn Residence. However, every other week the Adjmis would host Friday dinner at the Manhattan Residence. On weeks when Friday dinner was held in Manhattan, the Adjmis would spend one or two nights at the Manhattan Residence. As a result, Condor would work Tuesdays, Thursdays, Fridays, and Saturdays at the Manhattan Residence and Mondays and Wednesdays at the Brooklyn Residence.

34. When working as a live-in housekeeper at the New Jersey Residence from 2016 through 2019, Condor's regular weekly work schedule was Thursday through Monday from approximately 9:00 a.m. until a time between 9:00 p.m. or 10:00 p.m., except for Fridays when she typically worked until 11:00 p.m. because of the Friday dinners. During these periods, Condor worked between sixty-two to sixty-six hours per week.

35. As a result of the COVID-19 crisis, Condor's work schedule as a live-in housekeeper at the New Jersey Residence was altered from 2020 to the end of her employment on June 19, 2022. Rather than having two days off each week, Condor worked two-week cycles where she would work twelve days straight followed by two days off. For example, Condor would have a Tuesday and Wednesday off before returning Thursday morning and working for twelve days straight before having another Tuesday and Wednesday off. As a result, Condor's schedule during this period alternated between five- and seven-day work weeks.

36. When Condor worked five-day workweeks, she worked from 9:00 a.m. to a time between 9:00 p.m. and 10:00 p.m. on Thursdays, Saturdays, Sundays, and Mondays and from 9:00 a.m. to 11:00 p.m. on Fridays. When Condor worked seven-day workweeks, she worked from 9:00 a.m. to a time between 9:00 p.m. and 10:00 p.m. from

7

Saturday through Thursday and from 9:00 a.m. to 11:00 p.m. on Fridays. When working these schedules, Condor worked between sixty-two and ninety-two hours per workweek.

37. Throughout her employment, Defendants did not monitor or record the number of hours that Condor worked per workday or per workweek.

**Condor's Compensation**

38. Throughout her employment, Defendants paid Condor on a day rate basis.

39. Throughout her employment, Defendants paid Condor in cash with no accompanying wage statements.

40. Because Condor did not receive paystubs from Defendants, she could not verify how many hours she worked per workweek, her regular or overtime wage rates paid or that should have been paid, or the calculation of her weekly wages.

41. From 2016 through February 2017, Defendants paid Condor $90 per day worked.

42. From March 2017 through the end of her employment, Defendants paid Condor $100 per day worked.

**Condor's Termination**

43. On Sunday, June 19, 2022, Condor was working at the New Jersey Residence. That day was Father's Day, and the Adjmis were hosting a celebratory lunch with all of their children and their families in attendance. Because the Adjmis' cook had left on medical leave a month prior and the part-time housekeeper would not begin until the following day, Condor was responsible for preparing, serving, and cleaning up the food for the Father's Day lunch while also completing her other cleaning duties throughout the residence.

44. When the Adjmis finished eating and began preparing to leave for another event outside the home, Alice Adjmi informed Condor she would also have to watch over her one-year-old grandson, who was sleeping upstairs, while the family was out. When Condor explained that she could not safely watch the infant while simultaneously completing her duties around the home, Alice Adjmi began calling Condor lazy and stupid for "refusing" to watch the child because doing so was "a part of her job." When Condor again tried to explain that she would not be able to finish all her duties in the home and safely watch the infant, Alice Adjmi began yelling the same insults at Condor before finally telling her she was "done" and "fired."

45. Despite firing Condor, Alice Adjmi and the rest of the family then proceeded to leave for the Father's Day event and left Condor in the home with the young child. Unwilling to leave the child unattended, Condor proceeded to watch the child while simultaneously attempting to finish her responsibilities. The family returned home at approximately 11:00 p.m. that evening. By that time there were no more trains back to New York City from Deal, New Jersey. Accordingly, Condor went to her basement bedroom and went to sleep. When she awoke the next morning, she was unsure of her employment status and began completing her responsibilities around the home. Upon waking up, Alice Adjmi confronted Condor again and began yelling that she was "stupid" and "lazy," along with other insults in English that Condor could not understand, before demanding that she leave the home immediately. Condor grabbed her things and left.

## FIRST CLAIM
### (NYLL – Unpaid Minimum Wages)

46. Plaintiff repeats and incorporates all foregoing paragraphs by reference.

47. The NYLL and its supporting New York State Department of Labor ("NYDOL") regulations require employers to pay employees at least the minimum wage rate for the first forty hours worked in a workweek. *See* N.Y. Lab. Law § 652; 12 N.Y.C.R.R. § 142–2.1(a)(1)(i).

48. Defendants are employers within the meaning of the NYLL §§ 190, 651(6), and 652, and NYDOL regulations, including but not limited to 12 NYCRR § 142 *et seq.*

49. Defendants employed Plaintiff within the meaning of the NYLL.

50. As a result of Defendants' wage payment practices, they failed to pay Plaintiff the minimum wages to which she was entitled under the NYLL and its supporting NYDOL regulations.

51. Defendants willfully violated the NYLL by knowingly and intentionally failing to pay Plaintiff minimum wages.

52. As a result of Defendants' willful violations of the NYLL, Plaintiff suffered damages and is entitled to recover her unpaid minimum wages, liquidated damages, pre- and post-judgment interest, and reasonable attorney's fees and costs.

## SECOND CLAIM
### (NJWHL – Unpaid Minimum Wages)

53. Plaintiff repeats and incorporates all foregoing paragraphs by reference.

54. Defendants are employers within the meaning of NJWHL and supporting New Jersey State Department of Labor Regulations, and employed Plaintiff as a non-exempt employee.

55. Defendants failed to pay Plaintiff the minimum wages to which she was entitled under the NJWHL.

56. Defendants willingly violated the NJWHL by knowingly and intentionally failing to pay Plaintiff the statutory minimum hourly wage rate.

10

57. Defendants were aware or should have been aware that the practices described in this Complaint were unlawful and have not made a good faith effort to comply with the NJWHL and supporting State Department of Labor Regulations.

58. Due to Defendants' willful violations of the NJWHL, Plaintiff is entitled to recover unpaid minimum wages, reasonable attorneys' fees and costs, liquidated damages, and pre- and post-judgment interest.

### THIRD CLAIM
### (FLSA – Unpaid Overtime Wages)

59. Plaintiff repeats and incorporates all foregoing paragraphs by reference.

60. Defendants were required to pay Plaintiff one and one-half (1½) times her regular hourly wage rates for all hours worked in excess of forty per workweek pursuant to the overtime wage provisions set forth in the FLSA, 29 U.S.C. § 207 *et seq.*

61. Defendants have failed to pay Plaintiff overtime wages to which she is entitled under the FLSA.

62. Defendants have willfully violated the FLSA by knowingly and intentionally failing to pay Plaintiff overtime wages.

63. Due to Defendants' violations of the FLSA, Plaintiff is entitled to recover unpaid overtime wages, liquidated damages, pre- and post-judgment interest, and reasonable attorneys' fees and costs of the action.

### FOURTH CLAIM
### (NYLL – Unpaid Overtime Wages)

64. Plaintiff repeats and incorporates all foregoing paragraphs by reference.

65. Under the NYLL, the Domestic Workers' Bill of Rights, and supporting NYDOL regulations, Defendants were required to pay Plaintiff one and one-half (1½) times her regular hourly wage rate for all hours worked in excess of forty per workweek.

11

66. Defendants have failed to pay Plaintiff the overtime wages to which she was entitled under the NYLL.

67. Defendants have willfully violated the NYLL by knowingly and intentionally failing to pay Plaintiff overtime wages.

68. Due to Defendants' willful violations of the NYLL, Plaintiff is entitled to recover unpaid overtime wages, liquidated damages, pre- and post-judgment interest, and attorneys' fees and costs.

### FIFTH CLAIM
### (NJWHL – Unpaid Overtime)

69. Plaintiff repeats and incorporates all foregoing paragraphs by reference.

70. Under the NJWHL, Defendants were required to pay Plaintiff one and one-half (1½) times her regular rate of pay for all hours worked in excess of forty in a workweek.

71. Plaintiff regularly worked more than 40 hours per week.

72. Defendants failed to pay Plaintiff the overtime wages to which she was entitled under the NJWHL.

73. Defendants' violations of the wage payment requirements of the NJWHL were part of their regular business practice and constituted a pattern, practice, and/or policy.

74. Defendants were aware or should have been aware that the practices described in this Complaint were unlawful and have not made a good faith effort to comply with the NJWHL with respect to the compensation of Plaintiff.

75. Defendants willfully violated the NJWHL by knowingly and intentionally failing to pay Plaintiff overtime wages.

76. Due to Defendants' willful violations of the NJWHL, Plaintiff is entitled to recover her unpaid overtime wages, reasonable attorneys' fees and costs of the action, and pre- and post-judgment interest.

### SIXTH CLAIM
### (NYLL – Unpaid Spread-of-Hours Pay)

77. Plaintiff repeats and incorporates all foregoing paragraphs by reference.

78. Defendants willfully failed to pay Plaintiff additional compensation of one hour of pay at the statutory minimum wage rate for each day during which her shift spread over more than ten hours.

79. By Defendants' failure to pay Plaintiff spread-of-hours pay, Defendants willfully violated Section 650 et seq., of the NYLL and the supporting NYDOL regulations, including, but not limited to, 12 N.Y.C.R.R § 142-2.4.

80. As a result of Defendants' willful violations of the NYLL, Plaintiff is entitled to recover unpaid spread-of-hours pay, liquidated damages, pre- and post-judgment interest, and reasonable attorneys' fees and costs of the action.

### SEVENTH CLAIM
### (NYLL – Failure to Provide Wage Statements)

81. Plaintiff repeats and incorporates all foregoing paragraphs by reference.

82. Defendants failed to furnish Plaintiff with a statement at the end of each pay period reflecting: rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; the regular hourly rate or rates of pay; the overtime rate or rates of pay; the number of regular hours worked, and the number of overtime hours worked; gross wages; deductions; allowances, if any, claimed as part of the minimum wage; and net wages; in violation of NYLL § 195(3).

83. Due to Defendants' violation of the NYLL, § 195(3), Plaintiff is entitled to recover from Defendants liquidated damages of $250.00 per workday, up to a maximum of $5,000, reasonable attorneys' fees, and costs and disbursements of the action, pursuant to the NYLL § 198(1–d).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment:

    a.    declaring that Defendants have violated the minimum wage provisions of the NJWHL and the NYLL and accompanying NYDOL regulations;

    b.    declaring that Defendants have violated the overtime wage provisions of the FLSA, NJWHL, NYLL, DWBR, and accompanying NYDOL regulations;

    c.    declaring that Defendants violated the spread-of-hours pay provisions of the NYLL and NYDOL regulations;

    d.    declaring that Defendants violated the wage statement and record-keeping provisions of the NYLL and WTPA;

    e.    declaring that Defendants' violations of the FLSA, NYLL, and NJWHL were willful;

    f.    awarding Plaintiff damages for unpaid minimum wages;

    g.    awarding Plaintiff damages for unpaid overtime wages;

    h.    awarding Plaintiff damages for unpaid spread-of-hours pay;

    i.    awarding Plaintiff liquidated damages pursuant to the FLSA, NYLL, and the NJWHL;

    j.    awarding Plaintiff statutory damages as a result of Defendants' failure to furnish wage statements pursuant to the NYLL and WTPA;

      k.      awarding Plaintiff pre- and post-judgment interest under the NYLL and NJWHL;

      l.      awarding Plaintiff reasonable attorneys' fees and costs incurred in prosecuting this action pursuant to the FLSA, the NYLL, and the NJWHL; and

      m.      awarding such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action.

Dated: New York, New York
       December 15, 2022

PECHMAN LAW GROUP PLLC

By: _____
Louis Pechman
Christian Mercado
488 Madison Avenue, 17th Floor
New York, New York 10022
Tel.: (212) 583-9500
pechman@pechmanlaw.com
mercado@pechmanlaw.com

*Attorneys for Plaintiff*